UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

CENTRAL LABORERS PENSION FUND,

No. CV04-826-MO

Plaintiff,

OPINION AND ORDER

v.

MERIX CORPORATION, et al.,

Defendants(s)

**MOSMAN, J.,**

Central Laborers Pension Fund, Lead Plaintiff in four consolidated securities class

actions, brought suit against Merix Corporation ("Merix" or "the Company") and four of Merix's

officers[1] (collectively, the "Merix Defendants") alleging securities fraud under Section 10(b) of

the Securities Exchange Act of 1934[2] and SEC Rule 10b-5[3] for allegedly false and misleading

public statements these defendants made between October 14, 2003 and May 29, 2004 (the

"Class Period"). Plaintiff also asserts claims against the Officer Defendants under Section 20(a)

of the Exchange Act[4] and Section 15 of the Securities Act of 1933[5] on the grounds that they are

"control persons" over Merix and therefore liable to the extent Merix may be found liable for a

---

[1] The Merix officers are CEO Mark Hollinger, CFO Janie Brown, Senior Vice President for Operations Anaya Vardya and Senior Vice President for Sales Daniel Olson (collectively, the "Officer Defendants").

[2] 15 U.S.C. § 78j(b) ("Exchange Act").

[3] 17 C.F.R. § 240.10b-5.

[4] 15 U.S.C.§ 78t(a).

[5] 15 U.S.C. § 77o ("Securities Act").

PAGE 1 - OPINION AND ORDER

primary violation of the securities laws. Finally, Plaintiff brings claims under Sections 11 and

12(a)(2) of the Securities Act against Defendants Merix, Hollinger, Brown, seven of Merix's

directors, and six underwriters (the "Underwriter Defendants")[6] for allegedly false and misleading

statements appearing in a January 28, 2004 Prospectus (the "Prospectus") issued in connection

with a secondary public offering of Merix shares.

Before the court are the Merix and Underwriter Defendants' motions to dismiss Plaintiff's

amended complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b). As set forth

below, Defendants' motions (#47 and #49) are GRANTED. With respect to the Merix

Defendants, Plaintiff failed to plead its fraud claims with the particularity required under

Rule 9(b) and the Private Securities Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA" or

"Reform Act"). Specifically, Plaintiff's complaint fails to identify with particularity the alleged

misstatements and omissions upon which its claims rest, the reasons for their falsity, or their

materiality. Furthermore, because Plaintiff's claims under Sections 11 and 12(a)(2) sound in

fraud, Rule 9(b) applies to these claims as well. However, Plaintiff has failed to plead these

claims against the Merix Defendants with the requisite particularity. Finally, Plaintiff has failed

to allege facts sufficient to state a claim against Defendants Merix, Hollinger and Brown under

Section 12(a)(2). Accordingly, Plaintiff's claims against the Merix Defendants are dismissed

with leave to re-plead.

With respect to Plaintiff's Section 11 and 12(a)(2) claims against the Underwriter

Defendants, Plaintiff has failed to plead with particularity the alleged false statements and

---

[6] The Underwriter Defendants include UBS Securities LLC ("UBS"), Thomas Weisel
Partners LLC ("Thomas Weisel"), Needham & Company, Inc. ("Needham"), Wells Fargo
Securities, LLC ("Wells Fargo"), Raymond James & Associates, Inc. ("Raymond James"), and
William Blair & Company, LLC (William Blair").

omissions that form the bases of its claims, and has failed to plead sufficient facts to create an inference that the omissions Plaintiff complains of rendered the Prospectus false. Accordingly, these claims are dismissed without prejudice. In addition, to the extent Plaintiff's Section 12(a)(2) claim against the Underwriter Defendants is brought on behalf of anyone other than investors who purchased Merix securities directly from the Underwriter Defendants pursuant to the Prospectus, that claim is dismissed with prejudice for lack of standing.

I.      **Plaintiff's claims**[7]

Merix is a manufacturer of complex multi-layer printed circuit boards ("PCBs") used to interconnect components of electronic products and systems. Merix's services include "quick-turn" prototyping, compressed lead-time volume services (which it refers to as "premium services"), and volume production of PCBs. Merix's quick-turn and premium services "are used in the design, test and launch phases of new electronic products and require rapid manufacturing, with industry delivery times ranging from as little as 24 hours to as long as 10 days." Compl. at ¶ 43. Merix receives a premium over the normal PCB price for its quick-turn and premium products. Merix's standard volume manufacturing services "are needed as a product progresses past the testing and design phases and into pre-production and then volume production." *Id.*

Prior to and during the Class Period, Merix was headquartered at a 73-acre campus in Forest Grove, Oregon. During that period Merix was also engaged in constructing a new facility in Wood Village, Oregon. The Company's five largest customers during the Class Period were Cisco Systems ("Cisco"), Motorola, Ericsson, Juniper Networks, and Nokia. In fiscal 2002 and

---

[7] On Defendants' motion to dismiss, the court presumes all factual allegations of the complaint to be true. *Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987). Accordingly, the following facts are taken from Plaintiff's amended complaint.

PAGE 3 - OPINION AND ORDER

2003, Cisco and Motorola each accounted for more than 10% of Merix's net sales.

Plaintiff alleges that during the Class Period, the Merix Defendants made "three main categories" of materially false and misleading statements. Pl.'s Br. at 5. The first category involves the Company's reported results of operations, including the repeated representation that such results were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). Plaintiff avers that Merix's revenues, earnings, and other reported financial metrics were grossly inflated throughout the Class Period because the Merix Defendants improperly recognized revenue for products they knew were defective and likely to be returned, in violation of GAAP. Second, Plaintiff alleges the Merix Defendants repeatedly asserted that demand for the Company's products was increasing and that Merix was increasing its market share, when in fact "major Merix customers began canceling orders as early as November of 2003." *Id*. at 6. Finally, Plaintiff alleges the Merix Defendants falsely claimed that its new Wood Village facility would increase its output capacity by up to 50 percent by the end of calendar 2004, and was "key" to the Company's ability to grow its "quick-turn" and premium services.

Plaintiff alleges that these false statements "conditioned the market," artificially inflating Merix's stock price. The Merix and Underwriter Defendants took advantage of the inflated price by executing a secondary offering of Merix stock in January 2004. In conjunction with that offering the Defendants issued a Prospectus containing materially false or misleading statements falling within the same categories identified above. In addition, Plaintiff alleges the Officer Defendants took advantage of the inflated stock price by engaging in insider sales of Merix's common stock throughout the Class Period.

On May 13, 2004, Merix revised downward the Company's guidance for the fourth

PAGE 4 - OPINION AND ORDER

quarter of fiscal 2004, which ended May 29, 2004. The Company announced that positive earnings previously forecasted to come in between $0.19 and $0.22 per diluted share were now expected to be a loss of ($0.03) to ($0.06) per share. The Company cited a "lower level of premium services business attributed to reduced demand by customers for expedited volume orders and reduced orders from a major customer" as the reasons for the decreased forecast. The Company further disclosed the detection of a "manufacturing process error" that affected three high volume part numbers with significant quantities scheduled for shipment in the fourth quarter. The Company announced that although replacement parts were being built, they would not be completed and shipped until the following quarter. Following the May 13, 2004 announcement, the price of Merix's stock dropped more than 30 percent – from $15.32 to $10.68 per share – in one day, resulting in a market capitalization loss of more than $90 million.

## II.   Merix Defendants

### A.   Section 10(b) fraud claim

#### 1.   Pleading standard

In ruling on a motion to dismiss for failure to state a claim, "the court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher*, 828 F.2d at 561 (citation omitted). "A motion to dismiss for failure to state a claim may not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th Cir. 2000) (internal quotations and citation omitted). "Nonetheless, conclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988).

PAGE 5 - OPINION AND ORDER

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, Plaintiff must allege: "(1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which [Plaintiff] relied (5) which proximately caused [Plaintiff's] injury." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002). Generally, the Federal Rules of Civil Procedure "do not require a claimant to set out in detail the facts upon which he bases his claim." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Rather, a complaint need only provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* However, Federal Rule of Civil Procedure 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The PSLRA likewise provides that a complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Where an allegation is made on information and belief, the Act requires that "the complaint shall state with particularity all facts on which that belief is formed." *Id.* This requires plaintiff to "provide a list of all relevant circumstances in great detail." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 984 (9th Cir. 1999). Finally, where, as here, a defendant's mental state is an element of plaintiff's claims, "the complaint shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

### 2.      False or misleading statements

To allege falsity under Rule 9(b) and the PSLRA, a complaint must set forth: "(1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." *Desaigoudar v. Meyercord*,

223 F.3d 1020, 1023 (9th Cir. 2000). Despite a voluminous 110-page complaint, Plaintiff fails to identify with particularity each allegedly misleading statement upon which Plaintiff's claims rest. While the complaint lists countless statements by the Merix Defendants, it does not identify which of these are allegedly false. For example, paragraph 60 of the complaint notes that Merix's January 6, 2004, Form 10-Q contained several statements. It does not state which of these statements, if any, were allegedly false.[8] Portions of some of the statements cited in the complaint are written in boldface, with the possible implication that the bold portions constitute the allegedly false statements. However, Plaintiff's memorandum in opposition to Defendants' motion identifies only non-bold statements as examples of the complaint's "specific statements made by the Defendants . . . that were false and misleading."[9] Indeed, after reading Plaintiff's memorandum it is less clear whether Plaintiff is asserting that each and every statement cited in the complaint is false and misleading[10] or, if less than all of the statements, which of the numerous statements form the basis of Plaintiff's claims.

---

[8] *See also* Compl. at ¶ 54 ("the Form 10-Q . . . provided, in part . . ."); ¶ 62 ("The release stated in part . . .").

[9] *See* Pl.'s Br. at 14 (citing: (1) non-bold statement in ¶ 54 that "[n]et sales were $30.7 million in the first quarter of fiscal 2004;" (2) non-bold statement in ¶ 55 that sales for the second quarter of fiscal 2005 were $37 million and that net income was $0.05 per diluted share; (3) non-bold statement in ¶ 60 that "[g]ross margin as a percentage of net sales was 14.9% . . . in the second quarter of fiscal 2004; and (4) non-bold statement in ¶ 75 that sales for the third quarter of fiscal 2004 were $44.1 million and that net income was $0.19 per diluted share); *see also In re Splash Tech. Holdings Secs. Litig.*, 160 F. Supp. 2d 1059, 1074-75 (N.D. Cal. 2001) ("The fact that certain sections of the report have been highlighted is not a reliable guide to determining which statements are alleged to be false, as bolded statements sometimes do not turn out to be actionable, while non-bolded statements sometimes are actionable.").

[10] This would include, for example, such statements as "[i]n September 2003, we announced our plans to complete the first phase of the capacity expansion program at our Wood Village, Oregon facility." Compl. at ¶ 54. It appears doubtful, but by no means certain, that Plaintiff is alleging that Merix did not make this announcement in September 2003.

PAGE 7 - OPINION AND ORDER

Absent such particularity, the complaint necessarily fails to identify the reasons why each such statement is misleading. For example, in its memorandum in opposition to Defendants' motion, Plaintiff identifies "Defendants' boastful statements concerning the Wood Village facility and its expected impact on the Company's financial condition" as one of the "categories" of false or misleading statements alleged in the complaint. Pl.'s Br. at 6. Plaintiff argues Defendants made false or misleading statements to the effect that Merix expected to use Wood Village to perform premium services and quick turn work, despite the fact that the facility was not designed to perform such work. *Id.* at 7. But Plaintiff does not identify, nor could the court locate, any statement by the Defendants alleged in the complaint to the effect that Merix would use Wood Village to perform premium services and quick turn work. The statements upon which Plaintiff relies state only that "[w]e expect the first phase of our expansion [of Wood Village] . . . to significantly enhance our quick-turn and premium services capability." Compl. at ¶ 60. This statement does not claim that the Wood Village facility would perform these services. In fact, in one of the statements cited by Plaintiff, Defendant Olson states that "[t]he sales organization is very excited about the commencement of operations in Wood Village since we were able to transfer volume production to that facility, which frees up capacity at Forest Grove for quick-turn and premium services orders." *Id.* at ¶ 78. The contrast between Plaintiff's characterization of the "category" of Defendants' alleged Wood Village misrepresentations and the actual statements identified in the complaint highlights the necessity of specifically identifying the statements upon which Plaintiff's claims rest and the reasons why each such statement is false. Plaintiff cannot meet the heightened pleading standards applicable to fraud claims by simply characterizing Defendants' statements, embedding in those characterizations assumptions not found in the

PAGE 8 - OPINION AND ORDER

statements themselves, and then explaining why Plaintiff's own assumptions are false.

"In short, plaintiffs have left it up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading." *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000). As such, Plaintiff's complaint fails to satisfy the pleading requirements of the PSLRA. 15 U.S.C. § 78u-4(b)(1). In addition, the court cannot assess the materiality of any allegedly false statements without knowing the precise statements at issue. The court likewise cannot rely on Plaintiff's characterization of Defendants' statements to determine whether they are subject to the PSLRA's safe harbor for forward-looking statements,[11] or whether Defendants acted with scienter in making those statements. *See, e.g., In re Daou Sys. Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) ("falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." (internal quotations and citation omitted)). Accordingly, Plaintiff's fraud claims are dismissed with leave to re-plead.

**B.     Claims under Sections 11(a) and 12(a)(2)**

**1.     Pleading standard**

Plaintiff seeks to hold the Merix Defendants liable under Sections 11 and 12(a)(2) of the Securities Act for their role in the issuance of the January 2004 Prospectus in conjunction with a secondary offering of Merix stock. Section 11 of the Securities Act imposes liability when "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to

---

[11] *See* 15 USC § 78u-5(c).

make the statements therein not misleading." 15 U.S.C. § 77k(a). Thus, to state a claim under

Section 11, a plaintiff must demonstrate "'(1) that the registration statement contained an

omission or misrepresentation, and (2) that the omission or misrepresentation was material, that

is, it would have misled a reasonable investor about the nature of his or her investment.'" *In re*

*Daou Sys.*, 411 F.3d at 1027 (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04

(9th Cir. 1996)). Section 12(a)(2) of the Securities Act imposes civil liability on any person who

sells securities through the use of certain instruments, including a prospectus, containing material

misstatements or omissions. 15 U.S.C. § 77l(a)(2). To establish liability under section 12(a)(2),

a plaintiff must allege that the defendants "solicited purchase of the securities for their own

financial gain." *In re Daou Sys.*, 411 F.3d at 1029.

Unlike claims under Section 10(b), claims under Sections 11(a) and 12(a)(2) do not

contain an element of fraud. *Id.* at 1027. As such, these claims typically are subject to Federal

Rule of Civil Procedure 8(a)'s requirement of "a short and plain statement of the claim."

However, where Plaintiff's claims "sound in fraud," the heightened requirements of Rule 9(b)

apply, requiring Plaintiff to plead its allegations with particularity. *In re Daou Sys.*, 411 F.3d

at 1027. Where a plaintiff chooses "not to allege a unified course of fraudulent conduct in

support of a claim, but rather to allege some fraudulent and some non-fraudulent conduct . . .

only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements." *Vess*

*v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003). In those situations, the court

disregards the fraud allegations in construing the Securities Act claims and evaluates whether

Plaintiff has stated a claim in the absence of those allegations under Rule 8(a). Where, however,

the plaintiff alleges "a unified course of fraudulent conduct" and relies on that conduct as the

basis of its Securities Act claim, "the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Id*.

In the instant action, Plaintiff argues that because its Securities Act claims expressly disclaim any assertion that Defendants are liable under that Act for fraudulent or intentional conduct, these claims necessarily do not sound in fraud. However, "[t]hese nominal efforts are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus." *In re Stac Elecs.*, 89 F.3d at 1405 n.2. The substance of the alleged misrepresentations and omissions that form the basis of Plaintiff's Securities Act claims is virtually identical to that of the statements underlying its Exchange Act claims – namely, exaggerated customer demand, overstated earnings, and overly optimistic statements about the Wood Village facility. Plaintiff does not explain how misstatements knowingly made before and after issuance of the Prospectus could have been merely negligently made in relation to the Prospectus – particularly when the complaint alleges that the Prospectus incorporated by reference Merix's previously announced financial information. *See* Compl. at ¶ 168; *see also In re Metricom Sec. Litig.*, No. C 01-4085 PJH, 2004 WL 966291, at *24 (N.D. Cal. Apr. 29, 2004) ("Plaintiffs cannot allege fraud based on a series of events occurring before the offering and on essentially identical events continuing after the offering, and then scissor out a non-fraud claim from the center of that unified course of conduct in order to evade the Rule 9(b) requirement."). Because Plaintiff's Securities Act claims sound in fraud, Plaintiff must plead these claims with the particularity required under Rule 9(b).

As noted above, Plaintiff's complaint fails to identify with particularity the alleged

PAGE 11 - OPINION AND ORDER

misstatements and omissions upon which its claims rest, the reasons for their falsity, or their materiality. Accordingly, Plaintiff's Securities Act claims against the Merix Defendants are likewise dismissed with leave to re-plead.

**2.    Plaintiff's Section 12 claims against Merix, Hollinger and Brown**

Section 12(a)(2) provides that "[a]ny person who– offers or sells a security" by means of a misleading prospectus "shall be liable . . . to the person purchasing such security from him." 15 U.S.C. § 77l(a)(2). The Merix Defendants move to dismiss Plaintiff's Section 12 claims against Merix, Hollinger and Brown on the grounds that they are not "sellers" as contemplated by that section. The court agrees.

Plaintiff appears to argue that Merix is liable as a seller because it was Merix's stock that was sold in the January offering. Simply put, this is not the law. In *Pinter v. Dahl*, 486 U.S. 622 (1988), the Supreme Court determined that Section 12 "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Id*. at 643 n.21. In the instant action, Merix sold its shares to the Underwriter Defendants pursuant to a "firm commitment" underwriting – i.e., "one in which the underwriter agrees to buy all the shares to be issued and remains financially responsible for any securities not purchased." *In re Infonet Servs. Corp. Secs. Litig.*, 310 F. Supp. 2d 1080, 1100 (C.D. Cal. 2003). "[I]n a firm commitment underwriting . . . the public cannot ordinarily hold the issuers liable under section 12, because the public does not purchase from the issuers. Rather, the public purchases from the underwriters, and suing the issuers is an attempt to recover against the seller's seller." *Lone Star Ladies Inv. Club v. Schlotsky's Inc.*, 238 F.3d 363, 370 (5th Cir. 2001) (internal quotations and

PAGE 12 - OPINION AND ORDER

citation omitted). Accordingly, Plaintiff cannot hold Merix liable simply because Merix

originally sold to the Underwriters the stock that Plaintiff purchased from the Underwriters.

That said, it is also true that an individual need not have actually passed title to a

purchaser in order to be deemed a "seller" under Section 12. Rather, that designation also applies

to any individual who "successfully solicits the purchase, motivated at least in part by a desire to

serve his own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 647. The

*Pinter* Court identified "a securities vendor's agent who solicited the purchase" as an example of

a person who "would be commonly said, and would be thought by the buyer, to be among those

'from' whom the buyer 'purchased,' even though the agent himself did not pass title." *Id*. at 644.

However, the Court expressly rejected the contention that Section 12 imposed liability for "mere

participation" in unlawful sales transactions, even if that participation constitutes "a substantial

factor in causing the transaction to take place." *Id*. at 649.

The only argument Plaintiff submits in support of the contention that the Merix

Defendants may be held liable as sellers is that "Hollinger and Brown, as signatories to the

January Prospectus, are solicitors pursuant to Section 12(a)(2)." The Ninth Circuit has not

addressed whether merely signing a Prospectus constitutes active solicitation sufficient to render

the signatory a "seller" under 12(a)(2). While district courts are split on this issue,[12] every Circuit

---

[12] *Compare In re Stratosphere Sec. Litig.*, 1 F. Supp. 2d 1096, 1120 (D. Nev. 1998) ("merely providing that Defendants signed the allegedly misleading registration statement or prospectus for a firm commitment offering is insufficient to prove that Defendants were sellers under section 12"), *and In re Infonet Servs.*, 310 F. Supp. 2d at 1101 (same), *with In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 945 (M.D. Tenn. 1999) (concluding that because "[a] Prospectus itself is considered a solicitation document . . . . Defendants who actually signed the Registration Statements may be said to have solicited the public to purchase the stock."), *and Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996) (denying motion to dismiss because "[a]lthough signing the registration statement need not constitute active

(continued...)

to have addressed the issue has determined that simply signing a registration statement or

prospectus is an insufficient legal basis for relief.[13]

This conclusion is in accord with the *Pinter* Court's determination that the fact that an

individual's activities constitute a "substantial factor" in a sale of securities is insufficient to

render that individual a seller under Section 12. *Pinter*, 486 U.S. at 649-50. In addition, to hold

otherwise would erase a critical distinction between Section 11, which expressly imposes liability

on any individual who signs a false or misleading registration statement, 15 U.S.C. § 77k(a)(1),

and Section 12, which imposes liability only on an individual who "offers or sells" a security.

15 U.S.C. § 77l(a)(2). As the *Pinter* Court noted:

> Section 11(a) explicitly enumerates the various categories of persons involved in
> the registration process who are subject to suit under that section, including many
> who are participants in the activities leading up to the sale. There are no similar
> provisions in § 12, and therefore we may conclude that Congress did not intend
> such persons to be defendants in § 12 actions.

486 U.S. at 650 n.26.

Moreover, because of the routine nature of an issuer signing a prospectus, imposing

Section 12 liability solely on the basis of an issuer's preparation of a prospectus would ignore the

---

[12](...continued)
solicitation, it is, at this stage of the proceedings, a sufficient allegation to permit Plaintiffs to
present evidence that, alone or in tandem with other acts, the signatures constituted active
solicitation.") (citation omitted).

[13] *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (rejecting the
contention that "signing the registration statement suffices for solicitation," and holding that
"[t]he issuer may only be liable under § 12(a)(2) if the plaintiff alleges that an issuer's role was
not the usual one; that it went farther and became a vendor's agent." (internal quotation omitted));
*Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989) (an issuer is not liable
"solely on the basis of its involvement in preparing the prospectus. The purchaser must
demonstrate direct and active participation in the solicitation of the immediate sale to hold the
issuer liable as a § 12(2) seller.").

*Pinter* Court's declaration that "a buyer cannot recover against his seller's seller." *Id*. at 644 n.21.

As the Fifth Circuit stated, "[v]irtually all issuers routinely promote a new issue, if only in the form of preparing a prospectus and conducting a road show." *Lone Star Ladies*, 238 F.3d at 370. If such participation in an offering sufficed to create Section 12 liability, stock purchasers could bring suit against issuers as a matter of course, even in the absence of having purchased the securities directly from the issuers.

This is particularly true where, as here, an issuer sells stocks to an underwriter through a firm commitment underwriting. Where the issuer does not pass title to a buyer, the issuer is subject to liability only when it actively solicits the sale and is "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 647. In a firm underwriting arrangement, however, the issuer realizes all of its profits from the offering by selling its shares to the underwriter, leaving the underwriter with responsibility for selling its shares to investors. The issuer therefore largely lacks the financial incentive to solicit further sales.

Accordingly, this court follows the weight of the authority finding that merely signing a prospectus does not qualify as soliciting a sale of securities sufficient to render an individual a seller for purposes of Section 12(a)(2). Because Plaintiff has asserted no other basis for Section 12 liability against Defendants Merix, Hollinger and Brown, this claim is dismissed against them with leave to re-plead.

## III.    Underwriter claims

### A.    Pleading standard

Plaintiff asserts claims against the Underwriter Defendants under Sections 11 and 12(a)(2)

of the Securities Act based on alleged misstatements and omissions in the January 28, 2004, Prospectus. As noted above, because Plaintiff's claims sound in fraud, they are subject to the heightened pleading standards of Rule 9(b). Accordingly, Plaintiff must identify each allegedly false statement or omission made by Defendants and "set forth an explanation as to why the statement or omission complained of was false or misleading . . . *when made*." *In re Stac Elecs.*, 89 F.3d at 1404 (emphasis in original) (internal quotation omitted).

**B.     False or misleading statements or omissions in the January Prospectus**

Plaintiff's Securities Act claims against the Underwriter Defendants suffer from the same infirmities as its claims against the Merix Defendants. The complaint quotes numerous passages found in the January 2004 Prospectus, highlighting portions thereof in bold print, but fails to identify which of these statements are alleged to have been false. The complaint therefore necessarily fails to articulate the reasons why such statements were false, as well as any basis for deeming such misstatements or omissions material. Accordingly, dismissal is appropriate on this basis alone.

While Plaintiff's complaint is deficient, Plaintiff's brief in opposition to the Underwriter Defendants' motion to dismiss does clearly identify six allegedly material facts omitted from the Prospectus. As set forth below, the court finds that even if these alleged omissions had been properly pled in the complaint, they are insufficient to meet the heightened pleading requirements of Rule 9(b).

**1.     The Company's Wood Village facility was strictly used for certain volume orders and, thus, could not "significantly enhance [Merix's] quick-turn and premium services capabilities."**

The allegation that failing to disclose this fact constitutes a material "omission" appears to

rest on the assumption that the only way Wood Village could "significantly enhance [Merix's] quick-turn and premium services capabilities" would be for Wood Village itself to perform these functions. Plaintiff identifies no statement to that effect in the Prospectus. To the contrary, the Prospectus states that Merix was expanding its existing Forest Grove facility as well, and that Merix was "significantly enhancing [its] high-end manufacturing capacity by expanding our Forest Grove and Wood Village facilities." *See* Prospectus at p. 25; *see also id.* at pp. 2, 18. Plaintiff's complaint itself acknowledges that Merix sought to enhance its capacity for quick-turn and premium services orders by transferring volume work to Wood Village, thereby freeing up capacity at the Forest Grove facility for high-end work. Compl. at ¶ 78. Plaintiff's conclusory allegation therefore does not create an inference that the claimed omission rendered the Prospectus false.

> **2.**     **Wood Village was hardly a "state-of-the-art" PCB manufacturing facility, as Wood Village operations included only: pre-cleaning, lamination, imaging, and DES (developing, etching and stripping) – forcing Merix to ship the unfinished boards to the Forest Grove facility where they were (1) prepared for press lamination, (2) pressed, (3) optimized, (4) drilled, (5) chemically scrubbed, (6) plated, (7) surfaced and (8) finished.**

Again, the allegation that failing to disclose these facts constitutes a material "omission" is purely conclusory. No allegation in Plaintiff's complaint creates an inference that in referring to the Wood Village facility as "state-of-the-art," the Prospectus created a false impression that the facility would be used for all stages of production, or that a facility must operate in that manner to earn the label "state-of-the-art."

> **3.**     **Wood Village could not have increased the Company's output by "50% by the end of calendar 2004" as two operational "bottle-necks" in the plating and drilling departments at the Company's Forest Grove facility prevented such an increase.**

This alleged omission fails for several reasons.  First, the allegation misrepresents the statements that actually appear in the Prospectus.  Nowhere does the Prospectus state that Wood Village would increase the Company's "output" by the end of calendar 2004.  Rather, the Prospectus repeatedly states that Merix expected the Wood Village facility to increase Merix's "production capacity" by that amount.  Because the complaint does not identify any claim in the Prospectus that Wood Village would increase Merix's output by the end of 2004, the alleged failure to state that Wood Village could not do so cannot constitute a material omission.

Second, the complaint contains no allegation that Wood Village did not in fact increase Merix's production capacity by 50% by the end of 2004.  Plaintiff's conclusory allegation that such an increase was not possible is no substitute for a factual allegation that the increase did not in fact occur – i.e., that the statements in the Prospectus were actually false.  Nor could Plaintiff's amended complaint, filed in November 2004, have contained any such allegation.  Neither do the confidential witnesses upon whom Plaintiff relies, identified as W-2 and W-9, lend this claim any support, since they left Merix's employ in February and June of 2004, respectively.

Finally, absent particularized allegations that the statements regarding Wood Village's potential for adding to Merix's capacity by the end of calendar 2004 were false, Plaintiff's complaint necessarily fails to explain how the Underwriter Defendants could have known they were false in January of 2004.

> **4.      Demand for Merix's "quick-turn," premium services and volume business had been decreasing materially since at least October 2003 and the Company's top customer – Cisco – had dramatically reduced its orders from the Company due to excessive inventory held by its electronic manufacturing service provider, Solectron.**
> **a.      Demand generally**

The Prospectus stated:

PAGE 18 - OPINION AND ORDER

- Our net sales were $37.0 million in the second quarter of fiscal 2004, an increase of 43% from net sales of $25.9 million in the second quarter of fiscal 2003. The increased net sales primarily resulted from an increase in unit shipments.[14]

- Unit shipments were 47% higher in the second quarter of fiscal 2004 compared to the same period in the prior year. Unit shipments were 55% higher in the first six months of fiscal 2004 compared to the first six months of fiscal 2003. The increase in volume was the result of increased end market demand as well as new program gains from existing customers and the addition of new customers.[15]

Plaintiff claims these allegations – and the other statements in the Prospectus referencing this alleged increase in demand[16] – are false or misleading because they failed to disclose that Merix had in fact begun to experience a decline in orders at some time between October 2003 and the end of the third fiscal quarter of 2004. Plaintiff's allegation rests upon a series of claims by confidential witnesses who recalled a slowdown in both volume and quick-turn orders:

- By October 2003, W-1 "noticed an abrupt decline in orders on the daily rosters." Whereas previously there had been "mostly" larger orders for 100 or 200 flats at a time, by October 2003 there were "rarely" large orders for 100 or more flats. In fact, the "typical" order size was four or five flats at a time and "printers were

---

[14] Compl. at ¶ 168.

[15] *Id.*

[16] *See, e.g., id.* at ¶ 169:

We believe end market demand increased primarily due to the economic expansion of the markets we serve, particularly the communications market. . . . We have also increased unit shipments. . . . We saw a strengthening of average pricing late in the second quarter of fiscal 2004 primarily as a result of increased demand for premium services as well as other product mix changes. . . . The increase in compressed lead-time volume orders is primarily the result of higher customer demand combined with longer standard lead-times. The level of prototype orders increased significantly compared to the prior year quarter due to our focus on growing this business. Although we expect quick-turn and premium services sales to continue to increase in dollar terms, the percentage of our net sales from these services will fluctuate.

often allowed to go home early due to a lack of work." Compl. at ¶ 90.

- "W-1 also began noticing order cancellations in November 2003, such that orders often were recalled and pulled from the process line." *Id*. at ¶ 91.

- W-2 stated that: "no later than November 2003, Merix experienced a precipitous drop off in PCB layer counts, thereby indicating that quick-turn and premium manufacturing was suffering." *Id*. at ¶ 92.

- "W-3 confirmed a noticeable sales slowdown . . . no later than early 2004." *Id*. at ¶ 97.

- "Nokia, a major Merix customer, experienced a large layoff in early 2004, which cut its PCB orders with Merix." *Id*.

- "Merix's largest customer, Cisco, delayed and cancelled numerous quick-turn prototype orders in the third fiscal quarter 2004." *Id*.

Each of these allegations lacks particulars regarding either the amount of any decline in

orders, the timing of such a decline, or both. The allegations that orders were "often" recalled,

and that Merix experienced a "precipitous drop off in layer counts" beginning in November 2003

are insufficient to create an inference that overall demand had declined by a material amount, or

that such decline persisted through the issuance of the Prospectus on January 28, 2004. The

allegation that "W-3 confirmed a noticeable sales slowdown . . . no later than early 2004"

likewise seeks to substitute an adjective ("noticeable") for a noun (e.g., an approximate amount)

that could suffice as a factual allegation. The statement also gives no indication of whether "early

2004" refers to a period before or after January 28, 2004. The allegations that Nokia and Cisco

cut orders with Merix "in early 2004" or "in the third fiscal quarter 2004" do not disclose how

substantial such cuts were, what proportion of Merix's overall sales they constituted, or whether

they occurred before January 28, 2004. W-1's claim that Merix experienced an "abrupt" decline

in orders indicates a sudden decline, but does not state how large the decline was or how long it

lasted. Likewise there is nothing in the complaint which creates an inference that the number of

"flats" in a "typical" order corresponds to the size or number of orders.

While it would be improper to view each of these allegations in isolation, neither can "[c]obbling together a litany of inadequate allegations . . . render those allegations particularized in accordance with Rule 9(b)." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004). In this instance, the sum of Plaintiff's allegations does not create an inference that the Prospectus misleadingly omitted facts related to a material decline in Merix's demand prior to January 28, 2004.

More fundamentally, none of these allegations renders the statements in the Prospectus false or misleading. Even if Merix experienced cancelled orders from certain customers – or even a general decline in orders – this would not render false the Prospectus' statements that Merix's second quarter 2004 net sales were 43% greater than its second quarter 2003 net sales; that "[u]nit shipments were 47% higher in the second quarter of fiscal 2004 compared to the same period in the prior year;" that "[u]nit shipments were 55% higher in the first six months of fiscal 2004 compared to the first six months of fiscal 2003;" or that "[t]he increase in volume was the result of increased end market demand as well as new program gains from existing customers and the addition of new customers." Likewise these allegations of cancelled orders by some customers, and even a general slowdown in orders placed, fail to render false the statements in the Prospectus claiming that Merix had an "expanding customer base" and had "added a significant number of new customers and many new programs with existing customers."

**b.    Cisco**

Plaintiff's allegations that the Prospectus' statements regarding demand were false or misleading for having failed to disclose a decline in orders from Cisco is similarly deficient.

PAGE 21 - OPINION AND ORDER

First, the complaint contains no allegation that Cisco's cancellation of orders occurred before the Prospectus issued. Plaintiff relies on W-3's recollection that Cisco delayed and cancelled numerous quick-turn prototype orders "in the third quarter of 2004." The third quarter of Merix's 2004 fiscal year runs through February 2004. Because Plaintiff fails to allege that Cisco's delays and cancellations of orders occurred before the Prospectus issued, Plaintiff has not explained why the statements in the Prospectus were false when made.

Even if Plaintiff had alleged that Cisco began cancelling orders before the Prospectus issued, it is not clear what statement in the Prospectus that fact would render false. The complaint cites paragraphs of the Prospectus which: (1) refer to Cisco as one of Merix's "five largest OEM customers for the first six months of fiscal 2004;" (2) state that "[s]ales attributed to [Merix's] five largest OEM customers comprised 67% and 59% of [Merix's] net sales in the second quarters of fiscal 2004 and 2003, respectively, and 68% and 60% of [Merix's] net sales in the first six months of fiscal 2004 and 2003, respectively;" and (3) state that Merix expected "to continue to depend upon a small number of customers for a significant portion of [its] sales for the foreseeable future." None of these statements is rendered false by Plaintiff's allegation that Cisco delayed and cancelled numerous quick-turn prototype orders in the third quarter of 2004.

Finally, the allegation that Cisco delayed or cancelled "numerous" quick-turn prototype orders fails to state with particularity the approximate number of orders cancelled or delayed, the size of those orders, or what proportion of Merix's business they constituted. Although Cisco was an important customer for Merix, Plaintiff has not pled with particularity sufficient facts to create an inference that the alleged decline in Cisco orders rendered the statements in the Prospectus regarding demand false or misleading.

PAGE 22 - OPINION AND ORDER

**5.    Merix's financial results showed an increase in revenues and gross margins, in part, because Merix managed its earnings by improperly deferring expenses and shipping defective merchandise.**

A plaintiff pleading irregularities in revenue recognition should allege "(1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or [company] employees involved in the transactions." *In re Daou Sys.*, 411 F.3d at 1016 (internal quotation and citation omitted). Although a complaint need not allege each of those particular details, it must state sufficient facts to allow the court to determine whether the alleged irregularities "were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *Id*. at 1017. The plaintiff must show with particularity how the irregularities "affected the company's financial statements and whether they were material in light of the company's overall financial position." *Id*.

In support of its allegation that the Prospectus was misleading because it failed to disclose that Merix improperly deferred expenses, Plaintiff relies on statements from a series of confidential witnesses attesting to lapses in Merix's quality control. As described below, these allegations, taken together, fail to state with particularity facts supporting the existence of the claimed omission.

The complaint states that W-4 claimed that "[b]y 2002 . . . employees were instructed to rush production to expedite the sale, ignoring quality assurance requirements." Compl. at ¶ 100. W-4 does not state that this practice occurred during the Class Period, that it resulted in shipments of defective products, that it resulted in returns from customers, that any such returns resulted in inflated revenues or gross margins, or that any such inflation was material. Likewise

PAGE 23 - OPINION AND ORDER

W-4's statement that "on more than one occasion during the Class Period, Motorola returned entire orders because every board had a defect" does not indicate on how many occasions this occurred, how large the orders were, whether they were material to Merix's financial health, or whether they resulted in an improper, material increase in reported revenues or gross margins. *Id*. at ¶ 103.

Plaintiff cites W-5 for the propositions that quality assurances were routinely ignored and that, as a result, "boards were 'often' sent to customers that were likely to be returned." *Id*. at ¶ 106. In addition to the lack of particulars in these allegations, the complaint provides no basis for inferring that these problems occurred during the Class Period. Indeed, it is not clear from the complaint how much of the Class Period W-5 worked at Merix, given that he left Merix in "late 2003." *Id*. at ¶ 104. While the allegation that "during the Class Period, there were three times as many expeditors as individuals in final audit" expressly alleges that this occurred during the Class Period, *Id*. at ¶ 105, this allegation does not support an inference that this practice resulted in returns or inflated revenues or gross margins, or that any such inflation was material.

In September 2003, W-6 allegedly observed expeditors rushing orders, noted that orders requiring a 100 percent quality check were only spot-checked, and recalled being instructed to ignore certain quality assurance tests and overlook visible defects in products. *Id*. at ¶ 109-110. W-8 alleges he witnessed pressure to ship orders in order to meet sales targets, including "numerous instances" in which his superiors instructed him to ship defective boards to the customer. *Id*. at ¶ 118-119. Again, these allegations do not support an inference that these practices occurred during the Class Period, that they resulted in returns or inflated revenues or gross margins, or that any such inflation was material.

Plaintiff's allegations that the Prospectus contained affirmative misrepresentations regarding quality control fail for the same reasons. Plaintiff alleges that the Prospectus falsely stated: (1) that Merix's Forest Grove facility was "certified under the ISO 9002 quality assurance model . . . [which] requires that we meet standards related to management, production and quality control, among others;" (2) that Wood Village would be operated under the same model; and (3) that Merix "use[s] total quality management systems to meet the highest industry standards for product quality." Plaintiff does not allege with any particularity that the Forest Grove facility was not in fact "certified under the ISO 9002 quality assurance model." As set forth above, Plaintiff's allegations regarding defects are not alleged with sufficient particularity to show that the statements that Merix "use[s] total quality management systems to meet the highest industry standards for product quality," or that Wood Village would use the same model, are false.

Taken together, Plaintiff's allegations do not plead with particularity that Merix manipulated its earnings to reflect increased revenues and gross margins.

**6.     Merix's glowing outlook was untenable and incomplete for the reasons cited above.**

This allegation is based on the alleged false statements and omissions discussed above. Because these allegations are insufficient even when considered together, Plaintiff's allegation that the Prospectus misleadingly communicated a false glowing outlook cannot form the basis of Plaintiff's claim.

In sum, the complaint fails to identify with particularity which specific statements in the Prospectus are allegedly false or misleading. In addition, the complaint fails to explain with particularity facts sufficient to create an inference that the claimed omissions rendered statements in the Prospectus misleading when made. Plaintiff's claims against the Underwriter Defendants

PAGE 25 - OPINION AND ORDER

are therefore dismissed without prejudice.

### C.    Standing for Section 12 claims

The Underwriter Defendants move to dismiss Plaintiff's Section 12(a)(2) claim against them to the extent it is brought on behalf of anyone other than investors who purchased Merix securities directly from the Underwriter Defendants pursuant to the Prospectus.  Plaintiff does not dispute that, to bring a claim under Section 12(a)(2), Plaintiff "must have purchased [its] securit[ies] directly from the issuer of the prospectus."  *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999).  Plaintiff argues, however, that Defendants' motion is premature, and that these issues are more appropriately addressed at the class certification stage.

Standing is a jurisdictional prerequisite that courts are bound to address at the threshold of a case.  *Hickman v. Block*, 81 F.3d 98, 101 (9th Cir. 1996); *see also Nordyke v. King*, 319 F.3d 1185, 1192 (9th Cir. 2003) (*citing Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L. Ed. 264 (1868) ("Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.")).  Accordingly it is not only appropriate but necessary for the court to consider Plaintiff's standing at the outset of this action.

Plaintiff seeks to represent a class of investors who purchased Merix securities beginning in October 2003, and continuing through May 13, 2004.  Neither the investors who purchased shares prior to the issuance of the January 28, 2004 Prospectus, nor those who purchased shares in the aftermarket following the issuance of the Prospectus, have standing to bring suit against the Underwriter Defendants under Section 12(a)(2).  Plaintiff's claim under that section is therefore dismissed with prejudice to the extent it is brought on behalf of these investors.

PAGE 26 - OPINION AND ORDER

## IV.     Conclusion

For the foregoing reasons, Defendants' motions to dismiss Plaintiff's complaint (#47 and 49) are GRANTED, and Plaintiff's complaint is dismissed without prejudice.  Plaintiff's claim under Section 12(a)(2) against the Underwriter Defendants is dismissed with prejudice to the extent it is brought on behalf of investors who did not purchase Merix securities directly from these Defendants pursuant to the Prospectus.  Merix's motion for judicial notice is DENIED as moot, with leave to re-file.

IT IS SO ORDERED.

DATED this   15th   day of September, 2005.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge